# No. 16–10790–E

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

————————

GAUDENCIO GARCIA-CELESTINO, ET AL.,

*Plaintiffs-Appellees,*

v.

CONSOLIDATED CITRUS LIMITED PARTNERSHIP,

*Defendant-Appellant.*

————————

On Appeal from the United States District Court
for the Middle District of Florida,
Fort Myers Division, No. 2:10–cv–542–MEA–MRM

————————

## BRIEF OF APPELLANT

————————

David J. Stefany
Brian W. Koji
**ALLEN NORTON & BLUE, P.A.**
324 S. Hyde Park Ave., Suite 225
Tampa, FL 33606
Telephone: (813) 251-1210
Facsimile: (813) 253-2006
dstefany@anblaw.com
bkoji@anblaw.com

Chilton Davis Varner
Merritt E. McAlister
Billie B. Pritchard
**KING & SPALDING LLP**
1180 Peachtree St., NE
Atlanta, GA  30309
Telephone:  (404) 572-4600
Facsimile:  (404) 572-5100
cvarner@kslaw.com
mmcalister@kslaw.com
bpritchard@kslaw.com

*Counsel for Appellant Consolidated Citrus Limited Partnership*

Dated: May 18, 2016

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1–1 to 26.1–3, Appellant Consolidated Citrus Limited Partnership ("CCL") submits this Corporate Disclosure Statement and Certificate of Interested Persons:

Agapito Aguilar, Luis Alberto, Plaintiff-Appellee

Agapito Aguilar, Simon, Plaintiff-Appellee

Aguilar-Bocanegra, Ernesto, Plaintiff-Appellee

Aguilar-Fabian, Porfirio, Plaintiff-Appellee

Aguilar Guerrero, Antonio, Plaintiff-Appellee

Aguilar-Guerrero, Miguel, Plaintiff-Appellee

Aguilar Landeros, Antonio, Plaintiff-Appellee

Aguilar Landeros, Gabriel, Plaintiff-Appellee

Aguilar Olanderos, Benjamin, Plaintiff-Appellee

Aguilar Olanderos, Jacinto, Plaintiff-Appellee

Aguilar Sanchez, Marcelo, Plaintiff-Appellee

Aguilon Aguilar, Esteban, Plaintiff-Appellee

Aguilon Aguilar, Jose D. Sergio, Plaintiff-Appellee

Aguilon Aguilar, Miguel Angel, Plaintiff-Appellee

Allen, Norton & Blue, P.A., Counsel for CCLP

Alonso Cruz, Amado, Plaintiff-Appellee

Angeles Gallardo, Felipe, Plaintiff-Appellee

Antonio Hernandez, Ruben, Plaintiff-Appellee

Aspen, Marvin E., Senior Judge for the U.S. District Court for the
     Northern District of Illinois

Barron Guardado, Rigoberto, Plaintiff-Appellee

Bautista Sanchez, Jose Martin, Plaintiff-Appellee

Bautista Sanchez, Ruben, Plaintiff-Appellee

Bocanegra Barrios, Pedro, Plaintiff-Appellee

Caballero Carrazco, Eduardo, Plaintiff-Appellee

Caballero-Palacio, Rodolfo, Plaintiff-Appellee

Camacho Bautista, Juan, Plaintiff-Appellee

Camacho Garcia, Jose Luis, Plaintiff-Appellee

Camacho-Garcia, Porfirio, Plaintiff-Appellee

Camacho-Garcia, Reynaldo, Plaintiff-Appellee

Camacho-Linares, Emanuel, Plaintiff-Appellee

Camacho Ortega, Eduardo, Plaintiff-Appellee

Camacho Ortega, Juan Gabriel, Plaintiff-Appellee

Camacho Ortega, Manuel, Plaintiff-Appellee

Campos Hernandez, Abelardo, Plaintiff-Appellee

Carballo Flores, Enrique, Plaintiff-Appellee

Carballo Flores, Mario, Plaintiff-Appellee

Carrazco Patino, Jaime, Plaintiff-Appellee

Castillo Moncada, Israel, Plaintiff-Appellee

Chappell, Sheri P., Judge for the U.S. District Court for the
Middle District of Florida

Chavez Ruiz, Pedro, Plaintiff-Appellee

Clement, Jr., Jamey H., Manager for Consolidated Citrus
Management, LLC

Consolidated Citrus Limited Partnership, Defendant-Appellant

Consolidated Citrus Investors, L.P., Limited Partner in CCLP

Consolidated Citrus Management, LLC, General Partner in CCLP

Cristobal Martinez, Santos, Plaintiff-Appellee

Cruz-Vicencio, Raymundo, Plaintiff-Appellee

De Leon Luna, Sabino, Plaintiff-Appellee

Diaz Cortes, Armando, Plaintiff-Appellee

Espinoza Espinoza, German, Plaintiff-Appellee

Espinoza Espinoza, J Socorro, Plaintiff-Appellee

Espinoza Espinoza, Liborio, Plaintiff-Appellee

Espinoza Flores, Javier, Plaintiff-Appellee

Espinoza Garcia, Francisco, Plaintiff-Appellee

Espinoza Garcia, J Refugio, Plaintiff-Appellee

Espinoza Garcia, Juan Severiano, Plaintiff-Appellee

Espinoza Vazquez, Fidel, Plaintiff-Appellee

Espinoza Vazquez, Rufino , Plaintiff-Appellee

Estrada-Gabriel, Raul Ismael, Plaintiff-Appellee

Ferro-Nieves, Daniel, Plaintiff-Appellee

Ferro-Nieves, Jose Manuel, Plaintiff-Appellee

Flores-Aguilar, Eduardo, Plaintiff-Appellee

Flores De La Cruz, Moises, Plaintiff-Appellee

Florida Legal Services, Inc., Counsel for Plaintiffs-Appellees

Francisco Montiel, Hermilo, Plaintiff-Appellee

Frazier, Douglas N., Magistrate Judge for the U.S. District Court
for the Middle District of Florida

Gallardo, Felipe Angeles, Plaintiff-Appellee

Garcia Aguilar, Benjamin, Plaintiff-Appellee

Garcia Aguilar, Pedro, Plaintiff-Appellee

Garcia-Celestino, Gaudencio, Plaintiff-Appellee

Garcia Garcia, Juan, Plaintiff-Appellee

Garcia Hernandez, Eladio, Plaintiff-Appellee

Garcia Martinez, Carmelino, Plaintiff-Appellee

Garcia-Martinez, Esiquio, Plaintiff-Appellee

Garcia Mata, Arturo, Plaintiff-Appellee

Garcia Resendiz, Edilberto, Plaintiff-Appellee

Garcia Reyes, Juan Ramon, Plaintiff-Appellee

Garcia Reyes, Sixtos , Plaintiff-Appellee

Gardiner, William, Secretary and Manager for Consolidated
     Citrus Management, LLC

Gonzalez-Caballero, J. Carmen, Plaintiff-Appellee

Gonzalez Caballero, J. Guadalupe, Plaintiff-Appellee

Gonzalez Cruz, Atenogenes, Plaintiff-Appellee

Gonzalez-Juarez, Juvenal, Plaintiff-Appellee

Gonzalez-Martinez, Espiridion, Plaintiff-Appellee

Gonzalez Medina, Jose Saturnino, Plaintiff-Appellee

Gonzalez Morales, Gilberto, Plaintiff-Appellee

Gonzalez Morales, Julio, Plaintiff-Appellee

Gonzalez Perez, Emir, Plaintiff-Appellee

Gonzalez-Caballero, J. Carmen, Plaintiff-Appellee

Granados Martinez, Arturo, Plaintiff-Appellee

Guerrero-Fabian, Pascual, Plaintiff-Appellee

Guzman-Romero, Simon, Plaintiff-Appellee

Hernandez Aguilar, Antonio, Plaintiff-Appellee

Hernandez Bautista, Carlos, Plaintiff-Appellee

Hernandez Bautista, Luis Adan, Plaintiff-Appellee

Hernandez Espinza, Omar, Plaintiff-Appellee

Hernandez Hernandez, Aurelio, Plaintiff-Appellee

Hernandez Hernandez, Benito Felipe, Plaintiff-Appellee

Hernandez Hernandez, Genaro, Plaintiff-Appellee

Hernandez Medina, Pablo, Plaintiff-Appellee

Hernandez Raya, Abel, Plaintiff-Appellee

Hernandez Rincon, Benito, Plaintiff-Appellee

Hernandez Rincon, Eudocio Tobias, Plaintiff-Appellee

Hernandez Rodriguez, Miguel Angel, Plaintiff-Appellee

Hernandez Sanchez, Ismael, Plaintiff-Appellee

Hernandez Tinajero, Atanasio, Plaintiff-Appellee

Hernandez Tinajero, Francisco, Plaintiff-Appellee

Hernandez Trejo, Gildardo, Plaintiff-Appellee

Hernandez Vazquez, Carlos Manuel, Plaintiff-Appellee

Hernandez, Juan, Plaintiff-Appellee

Honeywell, Charlene E., Judge for the U.S. District Court for the
   Middle District of Florida

Hunt, Jack, Manager for Consolidated Citrus Management, LLC

Juan Fernando, Francisco, Plaintiff-Appellee

King & Spalding LLP, Counsel for CCLP

King Ranch, Inc., Limited Partner in CCLP

Koji, Brian W., Counsel for CCLP

Landaverde Camacho, Andres, Plaintiff-Appellee

Landaverde Camacho, Juan, Plaintiff-Appellee

Landaverde Sanchez, Ismael, Plaintiff-Appellee

Leon Lopez, Margarito, Plaintiff-Appellee

Linares Jimenez, Primitivo, Plaintiff-Appellee

Linares Nieto, Margarito, Plaintiff-Appellee

Lopez Rea, Gildardo , Plaintiff-Appellee

Lucas, Charles W., President of Consolidated Citrus Management, LLC

Martinez-Aguilar, Procoro, Plaintiff-Appellee

Martinez Arreola, Rafael, Plaintiff-Appellee

Martinez Garcia, Benito, Plaintiff-Appellee

Martinez Hernandez, Silvestre, Plaintiff-Appellee

Martinez Zuniga, Camilo, Plaintiff-Appellee

Martinez, Antonio, Plaintiff-Appellee

Martinez, Karla C., Plaintiff-Appellee

Mata Chavero, J Felix, Plaintiff-Appellee

Mata-Cruz, Francisco, Plaintiff-Appellee

McAlister, Merritt E., Counsel for CCLP

McCoy, Judge Mac R., Magistrate Judge for the U.S. District Court for the Middle District of Florida

Mesa & Coe Law, P.A., Counsel for Plaintiffs-Appellees

Mesa-Estrada, Victoria, Counsel for Plaintiffs-Appellees

Migrant Farmworker Justice Project, Counsel for Plaintiffs-Appellees

Montes Resendiz, Obed, Plaintiff-Appellee

Moody Jr., James S., Judge for the U.S. District Court for the Middle District of Florida

Mora-Martinez, Alfredo, Plaintiff-Appellee

Morales Antonio, Ismael, Plaintiff-Appellee

Morales Antonio, Lazaro, Plaintiff-Appellee

Ordonez Vega, Roberto, Plaintiff-Appellee

Pritchard, Billie B., Counsel for CCLP

Ramirez Garcia, Jose, Plaintiff-Appellee

Ramirez Hernandez, Vicente, Plaintiff-Appellee

Rendon Ramirez, Heron, Plaintiff-Appellee

Resendiz-Alvares, Alvares Juaquin, Plaintiff-Appellee

Resendiz Alvarez, Juaquin, Plaintiff-Appellee

Rincon Resendiz, Valentin, Plaintiff-Appellee

Rivera Soria, Armando, Plaintiff-Appellee

Rodriguez Acevedo, Antonio, Plaintiff-Appellee

Rodriguez Acevedo, Rafael, Plaintiff-Appellee

Rodriguez Gonzalez, Ricardo, Plaintiff-Appellee

Rodriguez Hernandez, Inocente, Plaintiff-Appellee

Rodriguez Hernandez, Sergio, Plaintiff-Appellee

Rodriguez Rodriguez, Antonio, Plaintiff-Appellee

Rojas Maldonado, Jesus, Plaintiff-Appellee

Romero Rojas, Jose Jesus, Plaintiff-Appellee

Ruiz Aguillon, Jaime, Plaintiff-Appellee

Ruiz, Basiliso, Defendant and Owner and Director of Ruiz Harvesting, Inc.

Ruiz Harvesting, Inc., Defendant

Ruiz Landaverde, Antonio, Plaintiff-Appellee

Ruiz Landaverde, Emiliano, Plaintiff-Appellee

Ruiz-Landeros, Ramon, Plaintiff-Appellee

Ruiz-Olanderos, Martin, Plaintiff-Appellee

Ruiz Ruiz, Julio, Plaintiff-Appellee

Saavedra Hernandez, Carlos, Plaintiff-Appellee

Sanchez Aguilar, Samuel, Plaintiff-Appellee

Sanchez-Huerta, Palemon, Plaintiff-Appellee

Sanchez-Ibarra, Reynaldo, Plaintiff-Appellee

Sanchez Leal, Gabriel, Plaintiff-Appellee

Sanchez-Morales, Miguel, Plaintiff-Appellee

Sanchez Vega, Gerardo, Plaintiff-Appellee

Sanchez Vega, Isidro, Plaintiff-Appellee

Schell, Gregory S., Counsel for Plaintiffs-Appellees

Sensenig, Christine R., Counsel for Defendants Basiliso Ruiz and
Ruiz Harvesting, Inc.

Sensenig, Jeremy, Counsel for Defendants Basiliso Ruiz and Ruiz
Harvesting, Inc.

Sensenig Law Firm, P.A., Counsel for Defendants Basiliso Ruiz
and Ruiz Harvesting, Inc.

Serrano Munoz, Jose Everto, Plaintiff-Appellee

Sierra Hernandez, Jose Alfredo, Plaintiff-Appellee

Sierra Hernandez, Miguel Angel, Plaintiff-Appellee

Silva Calderon, Daniel, Plaintiff-Appellee

Stefany, David J., Counsel for CCLP

Thorpe, Shaina, Former Counsel for CCLP

Tinajero Landeros, Clemente, Plaintiff-Appellee

Tinajero Landeros, Manuel, Plaintiff-Appellee

Tolentino Del Valle, Salvador, Plaintiff-Appellee

Trejo Camacho, Juan, Plaintiff-Appellee

Underbrink, Robert J., Manager for Consolidated Citrus
Management, LLC

Varner, Chilton D., Counsel for CCLP

Vega-Camacho, Luis, Plaintiff-Appellee

Victoriano Santiago, Gumbercindo, Plaintiff-Appellee

Villalba Sanchez, Nicolas, Plaintiff-Appellee

Villalon Torres, Nicolas, Plaintiff-Appellee

> /s/ Chilton Davis Varner
> Chilton Davis Varner
>
> *Counsel for Consolidated Citrus
> Limited Partnership*

## STATEMENT REGARDING ORAL ARGUMENT

This is an appeal from a bench trial holding Appellant-Defendant Consolidated Citrus Limited Partnership responsible as a joint employer with Ruiz Harvesting, Inc. for Ruiz Harvesting's breach of employment contracts with Plaintiffs-Appellees.  Plaintiffs-Appellees were temporary agricultural workers under the federal H–2A visa program, which permits domestic companies to import non-resident laborers to meet domestic shortfalls in agricultural labor.  Consolidated Citrus contracted with Ruiz Harvesting to provide H–2A workers to harvest Consolidated Citrus fruit in Florida.  The federal regulations governing the H–2A program create a contractual relationship between the workers and their employer.  This appeal presents an issue of first impression in this (or any) Circuit: what standard applies to determine the "employer" in a contract formed under the H–2A regulations?

Consolidated Citrus argues that the common law answers that question, and the workers argue, instead, that the expansive and worker-friendly test under the Fair Labor Standards Act applies. Because this issue is novel, and of great importance to the agricultural industry, oral argument should aid the Court in its decisional process.

# TABLE OF CONTENTS

INTRODUCTION........................................................................1

STATEMENT OF JURISDICTION.................................................4

STATEMENT OF THE ISSUES....................................................5

STATEMENT OF THE CASE .......................................................5

   I.  The H–2A Program ..........................................................6

   II.  Statement of Facts ........................................................14

   III. The District Court's Decisions .......................................17

      A. The Economic-Reality Test the District Court Adopted..............18

      B. Application of the "Economic Reality" Test................................23

STANDARD OF REVIEW...........................................................26

SUMMARY OF ARGUMENT ......................................................27

ARGUMENT ...........................................................................30

   I.  The Determination Of Who Is The "Employer" Should Be Governed By Common Law Principles Of Agency For Purposes Of The H–2A Program .....................................................30

    A. The Proper Test Has Always Been the Common Law Agency Test.............................................................................30

    B. The Common Law Test Was an Unambiguous Implied Term in the H–2A Statute, Leaving No Gap for the Department to Fill with Its Original Mistaken Suggestion of the FLSA Test ..........37

    C. Under the Common Law Test, Consolidated Citrus Was Not the Workers' Employer......................................................41

   II. Even Under The Economic-Reality Test, Consolidated Citrus Was Not A "Joint Employer" With Ruiz Harvesting.............................44

CONCLUSION .......................................................................50

# TABLE OF AUTHORITIES

## Cases

*Aimable v. Long and Scott Farms,*

20 F.3d 434 (11th Cir. 1994) ....................................................... passim

*Antenor v. D & S Farms,*

88 F.3d 925 (11th Cir. 1996) ............................................. 27, 53, 55, 59

*Arriaga v. Florida Pac. Farms, L.L.C.,*

305 F.3d 1228 (11th Cir. 2002) .......................................................... 11

*Ashkenazi v. South Broward Hosp. Dist.,*

607 F. App'x 958 (11th Cir. 2015) ...................................................... 51

*Avila-Gonzalez v. Barajas,*

No. 2:04CV567–FTM–33DNF, 2006 WL 643297

(M.D. Fla. Mar. 2, 2006) .................................................................... 12

*Clay v. Johnson,*

264 F.3d 744 (7th Cir. 2001) .............................................................. 40

*Community for Creative Non-Violence v. Reid,*

490 U.S. 730, 109 S. Ct. 2166 (1989) ...................................... 13, 50, 53

*Dean v. United States,*

556 U.S. 568, 129 S.Ct. 1849 (2009) .................................................. 48

*Fathauer v. United States,*

566 F.3d 1352 (Fed. Cir. 2009) .......................................................... 50

*Guijosa-Silva v. Wendell Roberson Farms,*

No. 7:10–CV–17 (HL), 2012 WL 860394

(M.D. Ga. Mar. 13, 2012) ................................................................... 44

*Josendis v. Wall to Wall Residence Repairs, Inc.*,

    662 F.3d 1292 (11th Cir. 2011) ........................................................... 47

*Kelley v. Southern Pacific Co.*,

    419 U.S. 318 (1974) ............................................................................. 14

*Liquilux Gas Corp. v. Martin Gas Sales*,

    979 F.2d 887 (1st Cir. 1992) ............................................................... 42

*Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*,

    297 U.S. 129, 56 S.Ct. 397 (1936) ............................................ 41, 45, 46

*Mitchell v. Osceola Farms Co.*,

    447 F. Supp. 2d 1307 (S.D. Fla. 2006) ................................................. 8

*Nationwide Mut. Ins. Co. v. Darden*,

    503 U.S. 318, 112 S.Ct. 1344 (1992) ........................................... passim

*New York Life Ins. Co. v. United States*,

    190 F.3d 1372 (Fed. Cir. 1999)........................................... 35, 46, 49, 50

*Ojeda-Sanchez v. Bland Farms, LLC*,

    No. 608CV096, 2010 WL 3282984 (S.D. Ga. Aug. 18, 2010) ............... 44

*Piamba Cortes v. American Airlines*,

    177 F.3d 1272 (11th Cir. 1999) .................................................. 3, 41, 42

*Pope v. Shalala*,

    998 F.2d 473 (7th Cir. 1993) ..................................................... 40, 42, 43

*Proudfoot Consulting Co. v. Gordon*,

    576 F.3d 1223 (11th Cir. 2009) ........................................................... 32

*Quinlan v. Secretary, U.S. Dep't of Labor*,

    812 F.3d 832 (11th Cir. 2016) ............................................................. 50

iv

*Ramos-Barrientos v. Bland,*

    661 F.3d 587 (11th Cir. 2011) ............................................................. 8

*Russello v. United States,*

    464 U.S. 16, 104 S.Ct. 296 (1983) ...................................................... 48

*Rutherfood Food Corp. v. McComb,*

    331 U.S. 722 (1947) ............................................................................ 59

*Sejour v. Steven Davis Farms, LLC,*

    28 F. Supp. 3d 1216 (N.D. Fla. 2014) ................................................. 44

*Tartell v. S. Fla. Sinus & Allergy Ctr., Inc.,*

    790 F.3d 1253 (11th Cir. 2015) .......................................................... 32

*United States v. Rosenwasser,*

    323 U.S. 360, 65 S. Ct. 295 (1945) ............................................... 15, 26

*United States v. Scroggins,*

    880 F.2d 1204 (11th Cir. 1989) .......................................................... 40

*United States v. Sepulveda,*

    115 F.3d 882 (11th Cir. 1997) ............................................................ 41

*United States v. Stinson,*

    30 F.3d 121 (11th Cir. 1994) .............................................................. 43

*Virgo v. Riviera Beach Associates, Ltd.,*

    30 F.3d 1350 (11th Cir. 1994) ............................................................ 51

*Walling v. Portland Terminal Co.,*

    330 U.S. 148, 67 S.Ct. 639 (1947) ...................................................... 26

*Wright v. Director, Fed. Emergency Mgmt. Agency,*

    913 F.2d 1566 (11th Cir. 1990) .......................................................... 42

## Statutes

6 U.S.C. § 271 ......................................................................... 8

8 U.S.C. § 1101(a)(15)(H)(ii)(a) ............................................. 7

8 U.S.C. § 1104 ....................................................................... 8

8 U.S.C. § 1182 ....................................................................... 8

8 U.S.C. § 1188 ................................................................. 8, 31

8 U.S.C. § 1188(a) .................................................................. 7

8 U.S.C. § 1188(b) ................................................................ 10

8 U.S.C. § 1188(b)(2)(A) ....................................................... 10

8 U.S.C. § 1188(b)(2)(B) ....................................................... 10

8 U.S.C. § 1188(b)(3) ............................................................ 10

8 U.S.C. § 1188(b)(4) ............................................................ 10

8 U.S.C. § 1188(c)(1) ............................................................ 10

8 U.S.C. § 1188(c)(2)(A) ....................................................... 10

8 U.S.C. § 1188(c)(3)(A)(i) .................................................... 10

8 U.S.C. § 1188(c)(3)(A)(ii) ................................................... 10

8 U.S.C. § 1188(c)(3)(B)(i) .................................................... 10

8 U.S.C. § 1188(c)(3)(B)(ii) ................................................... 10

8 U.S.C. § 1188(c)(3)(B)(iii) .................................................. 10

28 U.S.C. § 1291 ..................................................................... 4

28 U.S.C. § 1331 ..................................................................... 4

28 U.S.C. § 1337 ..................................................................... 4

28 U.S.C. § 1367 ..................................................................... 4

29 U.S.C. § 1802(5) ................................................. 11, 28, 38, 39

29 U.S.C. § 1802(8)(B)(ii) ..................................................... 39

29 U.S.C. § 1854(a) ................................................................. 4

29 U.S.C. § 203(g) .......................................................... 11, 38

## Regulations

20 C.F.R. § 655.0(a)(2) ........................................................... 8

20 C.F.R. § 655.100 ................................................................ 7

20 C.F.R. § 655.100(b) (1987) .............................................. 11

20 C.F.R. § 655.100(b) (2006) .............................................. 31

20 C.F.R. § 655.100(c) (2009) ...................................................... 13, 14, 31

20 C.F.R. § 655.101(a)(1) .................................................................... 8

20 C.F.R. § 655.101(b)(1) .................................................................... 8

20 C.F.R. § 655.102(b) ........................................................................ 9

20 C.F.R. § 655.102(b)(14) .................................................................. 9

20 C.F.R. § 655.102(b)(9)(i) ................................................................ 9

20 C.F.R. § 655.102(b)(9)(ii) .............................................................. 16

20 C.F.R. § 655.103 ............................................................................ 9

20 C.F.R. § 655.103(b) ...................................................................... 14

52 Fed. Reg. 16770 ........................................................................... 11

73 Fed. Reg. 77110 (2008) ........................................................... 20, 32

73 Fed. Reg. 77197 ........................................................................... 37

73 Fed. Reg. 8538 (Feb. 13, 2008) ................................................ 12, 32

73 Fed. Reg. 8555 ....................................................................... 35, 37

74 Fed. Reg. 45906–01 (Sept. 4 , 2009) .................................... 12, 13, 32

80 Fed .Reg. 79614–02 ....................................................................... 9

## Constitutional Provisions

Florida Constitution, art. X, § 24 ............................................................ 4

## Legislation

Fair Labor Standards Act of 1938,
   75 Cong. Ch. 676, 52 Stat. 1060 ........................................................ 12

Immigration Reform and Control Act of 1986,
   Pub. L. 99–603, 100 Stat. 3411 (1986) ............................................... 38

Immigration Reform and Control Act,
   Pub. L. 99–603, 100 Stat. 3359 (1986) ........................................... 7, 12

**INTRODUCTION**

This case arises out of the federal H–2A visa program, which imposes certain obligations, including minimum-wage requirements, on the importers of non-domestic agricultural labor.  Although such regulations are intended to protect temporary workers from predatory and unfair practices, here they were misapplied to penalize a landowner who did not control, know about, or have the ability to prevent or correct the alleged wrongdoing.  Unbeknownst to Consolidated Citrus, Ruiz Harvesting breached minimum-wage requirements in the workers' employment contracts by secretly demanding that workers pay kickbacks to Ruiz Harvesting from the workers' weekly paychecks.

The district court found (in a bench trial) that Consolidated Citrus did not exercise significant control over the workers and had no control over their pay rates or methods of payment—much less, the kickbacks.  Doc. 222 at 36–37, 40–41.  Nevertheless, the court held Consolidated Citrus directly liable for Ruiz Harvesting's wrongdoing under the theory that Consolidated Citrus was a "joint employer" with Ruiz Harvesting as a matter of "economic reality."  Accordingly, the court found

1

Consolidated Citrus equally liable for Ruiz Harvesting's breach, of which Consolidated Citrus had been totally unaware.

The test the district court applied to find "joint employment" derived from the Fair Labor Standards Act ("FLSA"), **not** the statutory scheme governing the H–2A program.  Unlike other statutory schemes that do expressly incorporate the worker-friendly FLSA standard, the H–2A statute does not.  In such circumstances—when a statutory scheme does not expressly define a common term like "employer" or "employee"—it is "well established" that the common law defines that term.  *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–26, 112 S.Ct. 1344, 1348–50 (1992); *see also Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 444–445, 123 S.Ct. 1673, 1677–78 (2003).

In deciding to apply the FLSA test, the district court relied on Department of Labor regulations that appeared, for purposes of the H–2A program, to adopt the FLSA definition of "employer" and "employee." But those regulations were clarified in 2009 to make clear that the common law test of agency, and not the FLSA standard, should apply to the H–2A program.  Those amendments should have applied to this

case, which was filed after the amendments took effect, because it is well-settled that "clarification[s]" are effective *ab initio*. *Piamba Cortes v. American Airlines*, 177 F.3d 1272, 1283 (11th Cir. 1999).

There is another reason the district court should never have relied on the original suggestion of the Department's regulation: regulations that are inconsistent with a clear Congressional directive, including an implicit but unmistakable directive to apply common law, are a nullity.

Even had the FLSA test been the correct path below (which Consolidated Citrus denies), Consolidated Citrus never should have been held responsible for Ruiz Harvesting's wrongdoing. By placing undue weight on factors that had little value, application, or relevance in this particular context, the district court discounted the factor that should have mattered the most: how involved Consolidated Citrus was in setting the workers' pay rates. The undisputed facts show—and the district court found—that Consolidated Citrus was removed from and wholly ignorant of the kickbacks, and it received no portion of them. Consolidated Citrus was thus powerless to do anything to prevent the wrongdoing. Nevertheless, it was held liable.

The FLSA test should never have been applied to the contract

claims at all.  But even that test should never have produced this result.

## STATEMENT OF JURISDICTION

Plaintiffs-Appellees, temporary alien workers employed by Ruiz

Harvesting under the H–2A workers program, brought this class action

in the United States District Court for the Middle District of Florida.

The workers sought relief under the the Migrant and Seasonal

Agricultural Worker Protection Act ("MSPA"), 29 U.S.C. §§ 1801, *et seq.*;

the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, the

minimum wage provisions of the Florida Constitution, art. X, § 24; the

federal regulations governing the temporary and foreign agricultural

worker program, 20 C.F.R. §§ 655.100, *et seq.*; and the common law.  *See*

Doc. 34, ¶ 1.  The district court's jurisdiction over this litigation derives

from 28 U.S.C. §§ 1331, 1337, and 1367, and 29 U.S.C. § 1854(a).

This appeal arises from a final judgment entered in favor of the

workers following a bench trial.  That final judgment was entered on

January 26, 2016.  Doc. 249.  Consolidated Citrus filed a timely Notice

of Appeal on February 24, 2016.  Doc. 252.  This Court has jurisdiction

over the final judgment pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether common law agency principles define who is an "employer" for purposes of an H–2A temporary worker contract.

2.     Even if an economic-reality analysis properly defined who is an "employer" for purposes of an H–2A worker contract, whether the district court erred in holding Consolidated Citrus liable as a joint employer for failing to pay the required minimum wage, when it found specifically that Consolidated Citrus did not exercise control over the workers, nor had control over their pay rate and method of payment, nor knew that the minimum wage was not being paid.[1]

## STATEMENT OF THE CASE

This litigation began in September of 2010, when a class of temporary alien workers brought claims against Consolidated Citrus,

---

[1] The predominant relief afforded Plaintiffs in this case was compensation for breach of the H–2A contracts.  Nineteen of the Plaintiffs also received relief under the FLSA for claims related to reimbursable expenses (a modest total of $2,722.20).  *See* Docs. 249 at 2; 243 at 2.  Those claims are also being appealed to the extent the district court erred in concluding that Consolidated Citrus was a joint employer under the economic-reality test, so those Plaintiffs' claims are subsumed in issue 2.  For simplicity's sake, Consolidated Citrus will focus its discussion on the central issue on appeal, which relates to the contract claims, and will note, where necessary, the arguments that apply to the appeal of the FLSA claims.

5

Ruiz Harvesting, and Ruiz Harvesting's owner, Basiliso Ruiz, for alleged labor violations. *See* Doc. 1. Although the workers brought claims under numerous federal statutory and state-law theories, *see supra* at 4, the predominate claims resolved at trial and at issue in this appeal are common law claims against Consolidated Citrus for breach of the H–2A contracts between the workers and Ruiz Harvesting. Doc. 222 at 46; Doc. 249 at 1–3. With the exception of the few, small FLSA claims discussed in footnote 1, *supra*, all other claims were either voluntarily dismissed or dismissed by the district court.[2] *See* Doc. 249 at 1–3. The central issue on appeal is whether Consolidated Citrus, which was not a party to the workers' contracts, may nonetheless be held liable as a "joint employer" for the breaches of contract that resulted from the kickbacks.

## I.    The H–2A Program

### A.    Overview

The Immigration and Nationality Act authorizes U.S. employers to bring foreign workers into the United States to perform temporary

---

[2] Basiliso Ruiz and Ruiz Harvesting, the defendants responsible for the kickback scheme, settled the workers' claims. Doc. 144; Doc. 160. These defendants agreed to pay $250 per worker, or $67,000 total, to resolve the claims. Doc. 160 at 2, 5.

labor under certain strict conditions. *See* 8 U.S.C.

§§ 1101(a)(15)(H)(ii)(a), 1188(a). This program—known as the H–2A

program—was designed to allow domestic companies to meet labor

needs when domestic laborers may be unavailable, without adversely

affecting domestic workers or work conditions. *See* 20 C.F.R. § 655.100;

*see also Mitchell v. Osceola Farms Co.*, 447 F. Supp. 2d 1307, 1309 (S.D.

Fla. 2006) (describing purpose of H–2A program). Accordingly, an

agricultural employer may only import aliens to perform temporary

agricultural labor if the Department of Labor is satisfied that (1) there

are insufficient domestic workers to perform the job, and (2) the

employment of aliens will not adversely affect the wages and working

conditions of similarly situated domestic workers. *See* 8 U.S.C.

§ 1188(a); *Ramos-Barrientos v. Bland*, 661 F.3d 587, 592 (11th Cir.

2011) (outlining standard). Although the program has deeper roots,

Congress enacted the modern H–2A program as part of the Immigration

Reform and Control Act of 1986. *See* Pub. L. 99–603, 100 Stat. 3359

(1986).

Three federal entities manage the H–2A program. The

Department of Labor issues H–2A labor certifications and oversees

compliance with labor laws.  *See* 8 U.S.C. § 1188.  The U.S. Citizenship

and Immigration Services, a division of the Department of Homeland

Security, adjudicates the H–2A petitions.  6 U.S.C. § 271.  The

Department of State issues visas to the workers at overseas consulates.

8 U.S.C. §§ 1104, 1182.

The Department of Labor has enacted extensive regulations to

manage the H–2A petition and certification process.  *See* 20 C.F.R.

§§ 655, *et seq.* (2006).[3]  To seek admission of H–2A workers, an

employer must first file an application for a temporary labor

certification with the Department of Labor.  20 C.F.R. §§ 655.101(a)(1),

(b)(1).  That application must include a "job offer," and an agreement to

abide by applicable regulations.  20 C.F.R. § 655.101(b)(1).

Those regulations establish the minimum benefits, wages, and

working conditions that an employer must offer to a worker so as to

avoid adversely affecting similarly situated domestic workers and to

protect the non-domestic laborers.  *See* 20 C.F.R. §§ 655.0(a)(2),

---

[3] The regulations that apply to these guest workers' claims have been amended and renumbered since the time of the filing of this lawsuit.  To avoid confusion, Consolidated Citrus will refer to the 2006 governing regulations, rather than the current regulations, unless another version is otherwise relevant.

655.102(b), & 655.103.  Among those requirements, the employer must pay workers at least the applicable adverse effect wage (or the federal minimum wage, if higher) for every hour or portion thereof worked during a pay period.  20 C.F.R. § 655.102(b)(9)(i).  For example, the adverse effect wage, which is set by the Department of Labor each year, is currently $10.70 for Florida.  80 Fed .Reg. 79614–02.

Pursuant to 20 C.F.R. § 655.102(b)(14), the employer must provide the worker with a "copy of the work contract between the employer and the worker," which must contain "all of the provisions" detailed in the applicable regulations, including the minimum wage requirement. Where there is no separate writing between the worker and the employer, "the required terms of the job order [which include the regulations detailed above] and application for temporary alien agricultural labor certification shall be the work contract."  20 C.F.R. § 655.102(b)(14).  An employer may be held liable for a breach of the worker's contract, including the terms implied by regulation.  *See Arriaga v. Florida Pac. Farms, L.L.C.*, 305 F.3d 1228, 1246 (11th Cir. 2002); *Avila-Gonzalez v. Barajas*, No. 2:04CV567–FTM–33DNF, 2006 WL 643297, at *1 (M.D. Fla. Mar. 2, 2006) (noting that "H–2A workers'

9

claims . . . turn on interpretation of terms dictated by federal statutes and regulations").

### B.     "Employer" Under the H–2A Program

Although the statutory scheme creating the H–2A program uses the term "employer" 42 times, *see, e.g.*, 8 U.S.C. §§ 1188(b), (b)(2)(A), (b)(2)(B), (b)(3), (b)(4), (c)(1), (c)(2)(A), (c)(3)(A)(i), (c)(3)(A)(ii), (c)(3)(B)(i), (c)(3)(B)(ii), (c)(3)(B)(iii), it does not define the term.  Nor does the Act define any other related term, such as "employ" or "employee."

In these circumstances—where "the statute containing the term does not helpfully define it" and the term has "accumulated settled meaning under . . . the common law"—the Supreme Court has instructed that "a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."  *Darden*, 503 U.S. at 322, 112 S. Ct. at 1348 (1992) (quoting *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 109 S. Ct. 2166 (1989); internal quotation marks and alterations omitted).  To that end, when Congress has not defined "employee" (or "employer" or "employ," for that matter), the Supreme Court has repeatedly "concluded that Congress intended to describe the

10

conventional master-servant relationship as understood by common law agency doctrine." *Id.*, at 322–23 (internal quotation marks omitted); *see also Kelley v. Southern Pacific Co.*, 419 U.S. 318, 322–323 (1974).

Before the Supreme Court reiterated this "well established" principle in 1992, *id.* at 322, the Department of Labor promulgated a regulatory definition of "employer" in 1987 that appeared to differ from the common law definition.  The Department defined "employer" to include one that "***suffers or permits a person to work***" and "has an employer relationship with respect to employees . . . as indicated by the fact that it may hire, pay, fire, supervise or otherwise control the work of any such employee."  20 C.F.R. § 655.100(b) (1987) (emphasis added).

That definition—the "suffers or permits to work" standard— almost certainly was borrowed from the FLSA, 29 U.S.C. § 203(g), which is also expressly incorporated in the MSPA, 29 U.S.C. § 1802(5).[4] That definition, however, appears nowhere in the H–2A statutory scheme itself, which was adopted ***years after*** the FLSA and three years after the MSPA.  *Compare* Fair Labor Standards Act of 1938, 75 Cong.

---

[4] Although the Department did not explicitly identify the source of the "suffers or permits to work" language, with respect to other proposed regulations, the Department drew an express parallel between the FLSA and the MSPA.  *See* 52 Fed. Reg. 16770, 16770-71.

Ch. 676, 52 Stat. 1060, 1060 (defining "employ" to include "to suffer or permit to work"), *with* Immigration Reform and Control Act, Pub. L. 99–603, 100 Stat. 3359 (1986) (providing no definition for "employer," "employee," or "employ"). "Suffer or permit to work" is "the broadest definition [of 'employee'] that has ever been included in any one act." *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3, 65 S. Ct. 295, 296 n.3 (1945) (internal citation omitted).

But in February 2008 the Department proposed a clarification to the definition of an H–2A employer to "conform[] to the Supreme Court's holding in *Nationwide Mutual Insurance v. Darden*, 503 U.S. 318, 322–324 (1992)." 73 Fed. Reg. 8538, 8555 (Feb. 13, 2008). The Department explicitly stated that it was "proposing these ***clarifications*** to remove any confusion that may exist for agricultural employers who have compliance obligations under the FLSA, MSPA and the H–2A program." *Id.* (emphasis added). The common law definition the Department adopted was not only more consistent with *Darden*, but it was "more consistent with the statute than the definition contained in the 1987 [regulations]." 74 Fed. Reg. 45906–01 (Sept. 4 , 2009).

Accordingly, the Department removed the "suffers or permits a person to work" language from the "employer" definition and instead defined "employee" "under the general common law of agency." *Id.* at 8580. The "employee" definition further outlined some of the common law factors that could be used to determine the status of an individual's employment, including:

> the hiring party's right to control the manner and means by which the work is accomplished; the skill required; the source of the instrumentalities and tools for accomplishing the work; the location of the work; the hiring party's discretion over when and how long to work; and whether the work is part of the regular business of the hiring party. Other applicable factors should be considered and no one factor is dispositive.

*Id.* The Department emphasized that "employ" and "suffer or permit to work" are different concepts, and because "the use of suffer or permit to work is precluded by the Supreme Court opinion in *Nationwide Mutual Ins. v. Darden*, 503 U.S. 318, 322–323 (1992), the reference to suffer or permit to work has been removed." *Id.* at 77197.

The final rule became effective January 17, 2009. It explicitly defined "employee" under the general common law of agency. 20 C.F.R. § 655.100(c) (2009). Likewise, the definition of "employer" omitted the "suffers or permits to work" phrase. 20 C.F.R. § 655.100(c) (2009).

13

"Joint employment" was defined as "where two or more employers each have sufficient definitional indicia of employment to be considered the employer of an employee[.]" *Id.*

The regulations today are substantively the same and omit any reference to "suffers or permits to work." *See generally* 20 C.F.R. § 655.103(b).

## II.    Statement of Facts

Consolidated Citrus is one of the nation's largest citrus growers. Doc. 34, ¶ 17.  It primarily grows fruit to be processed into juice.  Doc. 222 at 3.  Harvesting fruit is "an integral part of [Consolidated Citrus's] business." *Id.* at 4.

Due to labor shortages during the 2005–06 season (the harvest season lasts from late November through the end of May or early June, *id.* at 3), Consolidated Citrus was barely able to harvest all of its fruit. *Id.* at 4.  This appeal involves two harvest seasons (2007–08 and 2008–09), during which Consolidated Citrus contracted with Ruiz Harvesting to provide workers to harvest Consolidated Citrus fruit.  *Id.* at 1.  Ruiz Harvesting, and not Consolidated Citrus, was responsible for obtaining

permission to hire these workers, recruiting them, and securing their entry into the United States.  *Id.* at 6–8.[5]

Consolidated Citrus set a total "pick and roadside rate" for Ruiz Harvesting's services based on "the net number of boxes of fruit harvested [by Ruiz Harvesting's workers] as determined by the weight of the [harvested] fruit."  *Id.* at 10.  Notably, Consolidated Citrus "generally did ***not*** know what [Ruiz Harvesting] paid the harvesters" themselves, *id.* at 12 (emphasis added), and Ruiz Harvesting "***alone*** determined the harvesters' piece rate," *id.* at 14 (emphasis added).  To pay its workers, Ruiz Harvesting—and it alone—set a pick rate (payable to its H–2A workers).  *Id.*  The prevailing piece rate at the time was between $0.85 and $0.90 per box of citrus harvested.  Doc. 210 at 118.

Under H–2A labor regulations, if a worker is paid on a piece-rate basis, instead of on an adverse effect hourly rate, and that rate does not equal the amount the worker would have been paid hourly, the employer must supplement the worker's earnings "so that the worker's earnings are at least as much as the worker would have earned during

---

[5] Consolidated Citrus also employed approximately 260 of its own H–2A workers directly, beginning with the 2007-08 harvest. *Id.* at 5–6.

the pay period if the worker had been paid at the appropriate hourly wage rate for each hour worked." 20 C.F.R. § 655.102(b)(9)(ii).

Ruiz Harvesting's third-party bookkeeper used a software program to calculate a worker's wages based on inputting the worker's piece-rate information as well as the hours the harvester had worked (recorded by machines owned by Consolidated Citrus, because Consolidated Citrus used the equipment for its own in-house harvesters). Doc. 222 at 13–14. As required by 20 C.F.R. § 655.102(b)(9)(ii), the program would automatically "build up" a worker's pay check if the piece rate resulted in a wage below the adverse effect wage. Doc. 222 at 14. (That hourly rate was $8.56 for the 2007–08 season and $8.82 for the 2008–09 season. *Id.* at 12 n.14.) The amount of build-up pay was readily identifiable as a line item on the worker's paystub. *Id.* at 21.

The workers alleged that Ruiz Harvesting regularly demanded that the workers return their build-up pay back to Ruiz Harvesting's owner, Basiliso Ruiz, or one of his representatives, resulting in wages that fell below the legally-required adverse effect wage. *Id.* at 22–23. Numerous workers testified that Ruiz (or another representative) told

16

them that the build-up pay came out of Ruiz's pocket and that if a worker refused to refund that pay, the worker would be sent home. *Id.* at 23. On payday, the Ruiz Harvesting crew leader would drive the workers to the bank where they withdrew their wages. *Id.* As the workers re-boarded the bus, the crew leader collected cash from the workers, representing their build-up pay for that particular week. *Id.* That amount varied by week, and if the worker had no build-up pay, he was not required to return any portion of his paycheck to Ruiz. *Id.*

It is undisputed that Consolidated Citrus knew nothing about the kickback scheme at the time. It is also undisputed that no one at Consolidated Citrus demanded the workers return any portion of their wages. No worker ever complained to Consolidated Citrus about the practice. *Id.* Indeed, several workers testified that they did not even know about Consolidated Citrus and considered Ruiz Harvesting and its employees to be their supervisors. *Id.* at 24.

## III.   The District Court's Decisions

The district court held Consolidated Citrus responsible for Ruiz Harvesting's breach of its obligation to pay its workers at least the adverse effect minimum wage. *See* Doc. 222 at 46. It ordered

17

Consolidated Citrus to pay class members $195,156.54 in damages (an amount to which, assuming liability, the parties stipulated). *See* Doc. 249 at 2–3. (That amount included $2,722.20 in stipulated damages on the remaining FLSA claims. *See* Doc. 243 at 2–3.) In more than five years of litigation, the district court made two pivotal decisions relevant to this appeal: first, selecting a standard to measure whether Consolidated Citrus was a joint employer with Ruiz Harvesting for purpose of the workers' breach of contract claims; and second, applying that test to the largely undisputed facts.

### A.     The Economic-Reality Test the District Court Adopted

At the summary-judgment stage, the district court (Judge Sheri Polster Chappell at the time) extended this Court's decision in *Aimable v. Long and Scott Farms*, 20 F.3d 434 (11th Cir. 1994), to determine who is a joint employer for purposes of the H–2A program. *See* Doc. 162 at 26–29. Under *Aimable*, which interpreted the FLSA and the MSPA (and not the Immigration and Reform and Control Act, which established the modern H–2A program), a court looks "not to the common law definitions of" employer/employee, "but rather to the 'economic reality' of all the circumstances concerning whether the

18

putative employee is economically dependent on alleged employer." *See Aimable*, 20 F.3d at 439.  Accordingly, a worker can have more than one employer under *Aimable*, even when that second employer would not meet the stricter common law test of agency.

Here, the district court extended *Aimable* to govern this case, because the Department of Labor's H–2A regulations in place during the 2007–08 and 2008–09 harvests defined "employer" as one who "suffers or permits a person to work"—consistent with the same language that appears in the statutory text of the FLSA and MSPA, *see id.* at 438, and that was construed in *Aimable*.  Doc. 162 at 26–28.

At the same time, however, the court recognized that the H–2A regulations had been modified in 2009, specifically to remove the "suffers or permits to work" language.  *Id.* at 28.  The court concluded that although "*Aimable*'s joint employment analysis applies to the breach of contract claims relating to the 2007–08 and 2008–09 harvest seasons, the same cannot necessarily be said for the 2009–10 season," which the revised regulation might have controlled.  *Id.* at 29.[6]  Later,

---

[6] Consolidated Citrus had argued that the "suffers or permits to work" definition in the 2006 regulations failed *Chevron*, because the common law definition applied under *Darden* left no gap for the

19

the court conclusively determined that the common law agency standard in the 2009 regulations did, in fact, apply to the 2009–10 harvesting season.  Doc. 182 at 12.  Thereafter, the workers dropped their breach of contract claims against Consolidated Citrus related to the 2009–10 harvesting season.  Doc. 222 at 32.

Although it applied the "suffers or permits to work" standard explored in *Aimable* to the claims from the 2007–08 and 2008–09 harvests, the court recognized in a footnote that "explanatory guidelines of the most recent H–2A regulations explain that the terms 'employer' and 'employee' ***were previously defined under common law agency principles*."  Doc. 162 at 28 n.7 (citing 73 Fed. Reg. 77110, 77197 (2008)) (emphasis added).  Because the two tests—the common law agency test and the "suffers or permits to work" test—are separate and distinct, "the regulations removed the 'suffers or permits to work' language ***to clarify*** that agency principles should dictate an employee-employer relationship."  *Id.*  (emphasis added).

Consolidated Citrus unsuccessfully sought reconsideration of the court's decision to apply *Aimable* to the 2007–08 and 2008–09 seasons.

---

Department to fill with an interpretive regulation.  *See* Doc. 155 at 8 n.17.  The district court never addressed this argument.

Consolidated Citrus again pointed out that, as required by *Darden*, 503

U.S. 318, 112 S.Ct. 1344 (1992), the common law test of agency should

control where the statutory scheme (like here) does not define

"employer" or "employee." *See* Doc. 182 at 9–10.  The court denied the

motion. *See* Doc. 182 at 11–12.  In the court's view, it was shackled to

the old regulation, despite *Darden* and the Department's later

"clarif[ication]" that agency principles should—before and after the

clarification—control whether  an employee-employer relationship

exists.  Doc. 162 at 28 n.7.

 The Supreme Court has described the "suffers or permits to work"

standard applied by the district court as "the broadest definition of

'employee' that has ever been included in any one act." *Rosenwasser*,

323 U.S. at 363 n.3, 65 S. Ct. at 296 n.3.  Indeed, that test is

"comprehensive enough to require its application to many persons and

working relationships, which prior to [the FLSA], were not deemed to

fall within an employer-employee category." *Walling v. Portland

Terminal Co.*, 330 U.S. 148, 150–51, 67 S.Ct. 639, 640–41 (1947).  The

standard's breadth is due to its emphasis on so-called "economic

reality," which takes into account "all of the circumstances concerning

whether the putative employee is economically dependent upon the alleged employer." *See Aimable*, 20 F.3d at 439; *see also Antenor v. D & S Farms*, 88 F.3d 925, 933–34 (11th Cir. 1996). The very purpose of the "suffers or permits to work" standard, said the court, is "to assign responsibility to businesses that did not directly supervise putative employees." *Antenor*, 88 F.3d at 933.

In deciding *Aimable*, this Court identified eight factors to be considered when evaluating whether an employee as a matter of "economic reality" depends on an employer: (1) the nature and degree of the grower's control of the farmworkers; (2) the degree of the grower's supervision, direct or indirect, of the farmworkers' work; (3) the grower's right, directly or indirectly, to hire, fire, or modify the farmworkers' employment conditions; (4) the grower's power to determine the farmworkers' pay rates or methods of payment; (5) the grower's preparation of payroll and payment of the farmworkers' wages; (6) the grower's ownership of the facilities where the work occurred; (7) the farmworkers' performance of a line-job integral to the harvesting and production of salable vegetables; and (8) the grower's and labor contractor's relative investment in equipment and facilities. 20 F.3d at

440–46.  The district court used these factors to guide the "joint employment" decision in this case.  Doc. 222 at 34–44.

### B.    Application of the "Economic Reality" Test

At the summary judgment stage, the court was unable to resolve whether Consolidated Citrus was a joint employer as a matter of law. Doc. 162 at 25.  The court found the *Aimable* factors to be largely in equipoise.  *Id.*  Further, a key factor—whether Consolidated Citrus had the "power to determine pay rates or methods of payment"—was in dispute and could not be resolved at the summary judgment stage.  *Id.* The court observed then that "[t]he authority to determine pay rates and methods of payment ***is especially probative here because [the workers'] claims rely, in large part, on an alleged kickback scheme utilized by Ruiz Harvesting*** to deny minimum wage to the workers."  *Id.*  (emphasis added).

Following a bench trial on the joint-employment issue, the district court (by then, Judge Marvin E. Aspen, a visiting judge from the Northern District of Illinois) held that an analysis of the *Aimable* factors weighed in favor of the workers.  Specifically, the court found:

- ***Nature and degree of control over the farmworkers***.  The court concluded that this "factor weighs against finding

[Consolidated Citrus] was Plaintiffs' joint employer."  Doc. 222 at 37.  Ruiz Harvesting "alone chose who to hire, how to hire, and how many total employees to recruit from Mexico." *Id.* at 36.  Consolidated Citrus "played no role" in Ruiz Harvesting's operation or in its "training, discipline, or retention of workers." *Id.*  Likewise, Consolidated Citrus "did not decide when each crew began their day, took breaks, or finished their work." *Id.*

- ***Degree of the supervision, direct or indirect, of the farmworkers' work***.  The court concluded that "this factor weighs heavily in Plaintiffs' favor." *Id.* at 39.  In the court's view, Consolidated Citrus "supervised the harvesters in substantial ways," including (1) assigning Ruiz Harvesting to particular blocks, advising how many workers would be required for each block, and clocking workers in and out; (2) checking in with Ruiz Harvesting crews roughly eight times a day and inspecting working conditions; and (3) ensuring compliance with citrus canker procedures, particularly in the 2007–2008 harvest season.[7] *Id.* at 37–38.

- ***Right, directly or indirectly, to hire, fire, or modify the farmworker' employment conditions.***  The court concluded "this factor slightly favors" Consolidated Citrus. *Id.* at 40.  The court observed that "[o]n the whole, [Consolidated Citrus] required contractors to obtain H–2A labor and assigned work at a higher level, but it did not help make human resource decisions as to specific workers." *Id.*

- ***Power to determine the workers' pay rates or methods of payment.***  The court concluded on this point—the one closest to the gravamen of Plaintiffs' complaint—that"[t]his factor weighs

---

[7] Consolidated Citrus's inspections were two-fold: the inspections ensured that the workers were meeting Consolidated Citrus's quality standards and legal compliance standards.  Consolidated Citrus's "supervisors checked for shiners, garbage, debris in tubs or trailers, and apparent safety hazards.  [Consolidated Citrus] also checked for toilets, hand washing facilities, and potable water."  Doc. 222 at 37.

solidly against a finding of joint employment" because Ruiz Harvesting "alone set Plaintiffs' pay method and pay rates." *Id.* at 40.

- ***Preparation of payroll and payment of the workers' wages.*** The court concluded that "[t]his factor unquestionably supports a conclusion that [Consolidated Citrus] was the harvesters' joint employer." *Id.* at 41. In particular, the court observed that Consolidated Citrus provided the timekeeping equipment and monitored workers' hours by scanning identification badges Consolidated Citrus also provided. *Id.* The court also concluded that it was "important" that Consolidated Citrus deducted up to one hour for travel between the grove entrance and picking site prior to sending weekly timekeeping reports to Ruiz Harvesting. *Id.*[8] Finally, the court noted that Ruiz Harvesting provided weekly reports of the gross and net income of each worker and that Consolidated Citrus determined that workers should be paid by direct deposit for the 2008–2009 season. *Id.*

- ***Ownership of the facilities where the work occurred.*** The court concluded this factor "favors" finding Consolidated Citrus was the workers' joint employer because there was "no question that [Consolidated Citrus] owns the groves where the harvesters labored." *Id.*

---

[8] Notably, one of the most important considerations to the court on this factor—that Consolidated Citrus "unilaterally deducted 'up to one hour per workday . . . to account, in part, for travel time between the gate at the grove entrance and the actual picking site,'" Doc. 222 at 41—has absolutely no bearing on the contract claims at issue in the appeal. That fact was important with respect to a claim related to gate-deduction losses, which the workers did not ultimately pursue. *See* Doc. 249 at 2 (amounts in judgment "reflect the Plaintiffs' voluntary dismissal of their claims and those of the other class members for additional compensation based on the travel time between the grove entrance gate and the daily picking site").

25

- ***Performance of a line-job integral to the harvesting and production of salable vegetables.*** The court concluded this factor "supports Plaintiffs' joint employer theory" because the parties did not dispute that harvesting fruit is an integral part of Consolidated Citrus's business. *Id.* at 42.

- ***Relative investment in equipment and facilities.*** The court concluded that "this factor weighs against finding [Consolidated Citrus] liable as a joint employer" because Ruiz Harvesting provided the workers with housing, transportation to and from the groves, field sanitation equipment, and all of the harvesting equipment used on a daily basis. *Id.* at 43.

Even though the court concluded that four of the eight factors weighed in Consolidated Citrus's favor, it nevertheless held Consolidated Citrus liable as a joint employer under *Aimable*. *Id.* at 43–44. In its view, two of those factors "somewhat" supported Consolidated Citrus (the first and the third) and two (the fourth and the eighth) "more soundly" supported the company. *Id.* at 43. Even though one of the factors that "more soundly" supported Consolidated Citrus was the "especially probative" pay rates and methods factor, Doc. 162 at 25, the court nevertheless found Consolidated Citrus to be liable for the forced kickbacks.

## STANDARD OF REVIEW

"After a bench trial," this Court "review[s] the district court's conclusions of law *de novo* and the district court's factual findings for

26

clear error." *Tartell v. S. Fla. Sinus & Allergy Ctr., Inc.*, 790 F.3d 1253, 1257 (11th Cir. 2015) (quoting *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230 (11th Cir. 2009)).  The question whether to hold a company liable as a joint employer is one of law, and this Court likewise analyzes each factor *de novo*.  *See Aimable*, 20 F.3d at 440.

## SUMMARY OF ARGUMENT

The district court erroneously held Consolidated Citrus liable as a "joint employer" with Ruiz Harvesting.  First, it applied the wrong test for deciding whether Consolidated Citrus was the workers' "employer." Because the statutory scheme governing the H–2A visa program does not define "employer" or "employ," Congress plainly intended that the common law agency rule govern that question.  *See Darden*, 503 U.S. at 322–23, 112 S.Ct. at 1348 (collecting cases).  The district court, instead, applied this Court's test in *Aimable*, 20 F.3d 434, which outlines a much different standard for determining employment, based on a distinctly different statutory scheme under the FLSA and MSPA.  Congress chose not to use the same definition of employer and employee as in the FLSA and MSPA when it enacted the H–2A program, even though it knew how to do that had it wanted to.  Only three years earlier, Congress had

27

enacted MSPA, expressly incorporating the FLSA definition of the employment relationship. *See* 29 U.S.C. § 1802(5). Neither the district court nor the Department of Labor should have disregarded Congress's intentional choice not to incorporate that definition into the Immigration Reform and Control Act.

The district court was misled by a Department of Labor regulation implementing the H–2A program. The Department on its own—not pursuant to language in the empowering legislation—defined "employer" using the same language as in the FLSA. But the Department's 2009 amendments made clear that the proper test under the H–2A program was—and always had been—the "common law test of agency," ***not*** the far more generous FLSA/MSPA "suffers or permits to work" standard. Those amendments were an express "clarification" to avoid conflict with *Darden.* As such, the amendments should have applied to the 2007–09 and 2008–09 harvests, as well as the 2009–10 harvest.

Alternatively, even if the district court correctly concluded that the 2009 amendments substantively changed (instead of clarified) the definition of "employer" and "employ" under the H–2A program, the

earlier version of the regulations was invalid *ab initio*.  The "suffers or permits to work" definition was in direct conflict with a clear, albeit implicit, Congressional directive.  Congress adopted the common law definition of employer, not the FLSA/MSPA's definition of employer, when it enacted the H–2A program.  That Congress spoke implicitly does not make its directive any less clear, *see Darden*, 503 U.S. at 322–23, 112 S.Ct. at 1348, and the Department was not free to fill any perceived gap in the H–2A statutory scheme by providing a definition of "employer" that was out-of-step with the common law.  *See New York Life Ins. Co. v. United States*, 190 F.3d 1372, 1382 (Fed. Cir. 1999) (rejecting definitional regulation under the first-step of the *Chevron* analysis because *Darden* supplied the rule of construction).

Under the proper common law test, there is little doubt that Consolidated Citrus was not the workers' employer.  It had no control over the critical functions at issue in this case: how, when, and how much these workers were paid—and how much they had to return to Ruiz as a condition of continued employment by Ruiz.  Because the facts are largely undisputed, this Court should decide that Consolidated Citrus was never a joint employer.

Even should the Court conclude that the *Aimable* test applies to the breach of H–2A contract claims, this Court should hold that Consolidated Citrus was not a joint employer for purposes of the contract claims and the remaining FLSA claims.  The district court recognized that four of the eight factors in the *Aimable* analysis weighed in favor of Consolidated Citrus.  The other four factors, in the court's view, weighed more in the workers' favor.  But the district court improperly discounted two highly significant factors here (amount of control and involvement in determining pay rates and methods of payment), especially since the workers attempted to hold Consolidated Citrus liable for failure to pay them minimum wage.

## ARGUMENT

### I.   The Determination Of Who Is The "Employer" Should Be Governed By Common Law Principles Of Agency For Purposes Of The H–2A Program

#### A.   The Proper Test Has Always Been the Common Law Agency Test.

The district court wrongly applied the regulation in place at the time these claims *accrued* during the 2007–08 and 2008–09 harvests, which defined "employer" as "[a] person, firm, corporation or other associate or organization which suffers or permits a person to work."  20

C.F.R. § 655.100(b) (2006).  In 2008, the Department of Labor proposed regulatory amendments disavowing that definition of employer to conform the regulation to the statutory text.  Because the statutory scheme governing the H–2A program, *see* 8 U.S.C. § 1188, does not define "employer," "employee," or "employment" for purposes of the H–2A program, it is "well established" that common law agency principles should have applied.  *See Darden*, 503 U.S. at 322–23, 112 S.Ct. at 1348 (internal quotation marks omitted; collecting cases).  Accordingly, in 2009 the Department defined "employee" "under the general common law of agency," and it defined "employer" to mean "a person, firm, corporation or other associate . . . [that] [h]as an employer relationship with respect to H–2A employees."  20 C.F.R. § 655.100(c) (2009).  The district court failed to recognize that the 2009 amendments that removed the "suffers or permits a person to work" definition were clarifications that should have directed the court's analysis.

When it proposed amending the regulatory definition of "employer" and "employee" in 2008, the Department of Labor expressly stated it was clarifying the definition, not changing it.  The Department explicitly stated that it was "proposing these ***clarifications*** to remove

31

any confusion that may exist for agricultural employers who have
compliance obligations under the FLSA, MSPA and the H–2A program."
73 Fed. Reg. 8538, 8555 (Feb. 13, 2008) (emphasis added).  The
"clarifications" were needed, the Department explained, to "conform[]
[that regulation] to the Supreme Court's holding in *Nationwide Mutual
Insurance v. Darden*, 503 U.S. 318, 322–324 (1992)."  *Id.*  These
revisions, the Department acknowledged, were also "more consistent
with the statute than the definition contained in the" regulations the
district court applied.  74 Fed. Reg. 45906–01 (Sept. 4 , 2009).

The district court was aware of the regulatory change that became
effective in January of 2009—more than a year before the workers filed
suit.  In its July 2013 order, the court observed that "the explanatory
guidelines of the most recent H–2A regulations explain that the terms
'employer' and 'employee' were ***previously defined*** under common law
agency principles," and that "suffers or permits to work" was removed
"to clarify that agency principles should dictate an employee-employer
relationship."  Doc. 162 at 28 n.7 (discussing 73 Fed. Reg. 77110, 77197
(2008)) (emphasis added).  Nevertheless, the district court then turned
in the opposite direction to apply *Aimable*'s "suffers or permits to work"

32

analysis based on the 2006 regulations.  The court did so despite

recognizing that the common law of agency and the economic reality of

*Aimable* were "distinct" and that "some parties who might not qualify

as [employers] under a strict application of traditional agency law

principles" would qualify as employers under the *Aimable* test.  *Id.* at

28 & n.7.

The district court failed to take the Department at its word that

the Department's prior interpretation of the statute needed to be

clarified as a matter of statutory construction.  An agency rule "simply

clarifying an unsettled or confusing area of the law . . . does not change

the law; but restates what the law according to the agency is and

always has been."  *Pope v. Shalala*, 998 F.2d 473, 483 (7th Cir. 1993),

*overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir.

1999)[9]; *see also United States v. Scroggins*, 880 F.2d 1204, 1215 (11th

Cir. 1989) (amendments to sentencing guidelines promulgated by

Sentencing Commission clarified rule but did not impose substantive

change and, therefore, could be applied to offenders convicted of

offenses before effective date of amendments).  Even where an

---

[9] The Seventh Circuit has continued to rely on *Pope*.  *See, e.g.*, *Clay v. Johnson*, 264 F.3d 744, 749 (7th Cir. 2001).

amendment contains "new language," it may still merely "clarify

existing law," "correct a misinterpretation," or "overrule wrongly

decided cases." *Piamba Cortes v. American Airlines*, 177 F.3d 1272,

1283 (11th Cir. 1999) (quoting United States v. Sepulveda, 115 F.3d

882, 885 n. 5 (11th Cir. 1997)).

Such a rule "is no more retroactive in its operation than is a

judicial determination construing and applying a statute to a case in

hand" and applies even to those actions that arise under an earlier

version of the regulation. *Manhattan Gen. Equip. Co. v. Comm'r of

Internal Revenue*, 297 U.S. 129, 133–35, 56 S.Ct. 397, 399–400 (1936)

(applying new regulation in lieu of the original regulation, which was

"contrary to the intent of the statute"). Put simply, "clarification,

effective *ab initio*, is a well recognized principle." *Piamba Cortes*, 177

F.3d at 1283 (quoting *Liquilux Gas Corp. v. Martin Gas Sales*, 979 F.2d

887, 890 (1st Cir. 1992))

An agency's interpretation of an amendment as a clarification,

rather than a substantive change, is entitled to great deference by a

reviewing court. *See Wright v. Director, Fed. Emergency Mgmt. Agency*,

913 F.2d 1566, 1571 (11th Cir. 1990); *Pope*, 998 F.2d at 483 ("In

34

determining whether a rule is a clarification or a change in the law, the

intent and interpretation of the promulgating agency as to the effect of

the rule is . . . given great weight.").  In fact, this Court has stated that

unless the agency's "viewing of the amendment as a clarification is

plainly wrong," the reviewing court should accept the agency's

interpretation.  *United States v. Stinson*, 30 F.3d 121, 122 (11th Cir.

1994) (discussing amendments to sentencing guidelines promulgated by

Sentencing Commission).

In this case, the agency guidance issued at the time of regulation's

proposal confirms that the Department's intent was merely to clarify

"an unsettled or confusing area of the law," not to effect a substantive

change.  *Pope*, 998 F.2d at 483.  The Department explained that it

"propos[ed] these ***clarifications*** to remove any confusion that may

exist for agricultural employers who" have multiple regulatory

obligations under different programs.  73 Fed. Reg. 8555 (emphasis

added).  The Department could not have spoken more clearly and

persuasively: the 2009 amendments were intended to effect a mere

"clarification" to reduce "confusion."

Further, the Department's stated purpose was consistent with the

uncertain state of the law.  There was significant ambiguity in the law

after *Darden*, because the existing regulations appeared to differ from

the Supreme Court's directive on settled statutory construction

principles.[10]  Accordingly, the amendments corrected a

misinterpretation in the law that began with the Department, not

Congress.  *See, e.g.*, *Manhattan Gen. Equip. Co.*, 297 U.S. at 135 ("Since

the original regulation could not be applied, the amended  regulation in

effect became the primary and controlling rule in respect of the

situation presented.").  In the guidance issued with the final rule, the

Department recognized that the amendments were needed because

---

[10] To be sure, courts had uniformly agreed that the "suffers or permits to work" language in the regulation supported looking to FLSA cases to define the scope of "employer" under the H–2A statutory scheme.  *See, e.g.*, *Sejour v. Steven Davis Farms, LLC*, 28 F. Supp. 3d 1216, 1226–27 (N.D. Fla. 2014); *Guijosa-Silva v. Wendell Roberson Farms*, No. 7:10–CV–17 (HL), 2012 WL 860394, *19 (M.D. Ga. Mar. 13, 2012) (deeming defendants "employers" under both the FLSA and H–2A contracts because "[f]ederal regulations defining the employer/employee under the H–2A are almost identical to the standards set by the FLSA"); *Ojeda-Sanchez v. Bland Farms, LLC*, No. 608CV096, 2010 WL 3282984, at *7 (S.D. Ga. Aug. 18, 2010) (similar).  Although there was not disagreement on that front, after the Supreme Court's decision in *Darden* (if not earlier, given that *Darden* merely reiterated a "well established" rule), there was a conflict between the regulation and the implied rule under *Darden*.

36

"*suffer or permit to work* is precluded by the Supreme Court opinion in *Nationwide Mutual Ins. v. Darden*, 503 U.S. 318, 322–323 (1992)."  73 Fed. Reg. 77197.  The amendment, therefore, was expressly intended to cure any "confusion."  73 Fed. Reg. 8555.

The common law agency test therefore should have applied to the workers' claims that accrued prior to the 2009 amendments.

**B.    The Common Law Test Was an Unambiguous Implied Term in the H–2A Statute, Leaving No Gap for the Department to Fill with Its Original Mistaken Suggestion of the FLSA Test**

Even had the 2009 amendments been substantive, rather than a mere clarification, the district court was not free to use *Aimable*'s economic-reality test to determine whether Consolidated Citrus was the workers' employer.  "[A] rule out of harmony with the statute, is a mere nullity."  *See Manhattan Gen. Equip. Co.*, 297 U.S. at 134.  "*Darden* teaches that where Congress does not define the term 'employee' [or employer] in a statute, the term has its common law meaning."  *New York Life Ins. Co.*, 190 F.3d at 1382.  That background principle is implied in **every** statutory scheme, leaving an agency that has been given gap-filling authority with no gap to fill.  *Id.* at 1379–80 (applying *Darden* to conclude that Congress had "directly spoken to the precise

37

question at issue" where *Darden* applied to give "employment" its common law meaning (internal quotation marks omitted)).  Accordingly, to the extent the Department of Labor's pre-2009 regulations imposed a definition that departed from the common law agency test, then the Department's regulation flunked the first step in the *Chevron* analysis. The regulation was void *ab initio*.  *See Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1320 (11th Cir. 2011) ("Where the statutory language is clear, agency regulations have no effect.").

At the time Congress enacted the modern H–2A program as part of the Immigration Reform and Control Act of 1986, Pub. L. 99–603, 100 Stat. 3411 (1986), it had two ready paths to take.  It could define "employer" or "employee" using the expansive and familiar "suffers or permits to work" standard Congress expressly adopted under the FLSA, 29 U.S.C. § 203(g), and expressly incorporated under the MSPA, 29 U.S.C. § 1802(5)—both of which were enacted before the 1986 enactment of the H–2A provisions.  Or, by not adopting the FLSA definition or otherwise expressly defining these terms, Congress could give "employer" or "employee" their common law meaning.  Congress chose the latter.  Given how related these various statutory schemes

38

are—all of which the Department of Labor regulates—the Department and courts alike should have presumed that Congress meant to apply a ***different*** employment standard under the H–2A.[11]  *Cf. Dean v. United States*, 556 U.S. 568, 573, 129 S.Ct. 1849, 1854 (2009) ("where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion") (quoting  Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 300–01 (1983)).

The Department was not free to override Congress's choice.  Its regulation purporting to adopt the FLSA's "suffers or permits to work" standard was a nullity from the outset.  The Federal Circuit confronted a similar situation in *New York Life Ins. Co.*, 190 F.3d 1372.  The question was whether a Department of Health and Human Services regulation that supplied a missing definition for "employment" in a Medicare statutory provision was entitled to *Chevron* deference.  *Id.* at 1376–77.  The court concluded that the regulation foundered on

---

[11] Underscoring this point, when Congress adopted the MSPA, it expressly ***excluded*** H–2A workers from the statute's coverage, 29 U.S.C. § 1802(8)(B)(ii), while expressly incorporating the FLSA's definition of employment, 29 U.S.C. § 1802(5).

*Chevron*'s first step: "Congress made clear its intent to limit [the relevant provision] to common law employees. Thus, because 'Congress had directly spoken to the precise question at issue,' this is a *Chevron* step-one case." *Id.* at 1379–80. (internal citation omitted). The Federal Circuit reasoned that Congress had spoken clearly, even though it had not spoken expressly. "*Darden* states a rule of statutory construction that squarely applies to this case," and the *Darden* rule, not the Department's regulation, filled any perceived gap in the statutory scheme. *Id.* at 1382; *see also Fathauer v. United States*, 566 F.3d 1352, 1356–57 (Fed. Cir. 2009) (concluding that the "words of the statute are unambiguous" where *Darden* supplied the default rule for defining common terms).

The same is true here. There was simply no gap for the Department of Labor to fill. Under *Darden*, Congress's silence was not a delegation of authority to the Department; rather, it was an implicit command that "Congress mean[t] to incorporate the established meaning of [the undefined terms]." *Darden*, 503 U.S. at 322, 112 S.Ct. at 1347–48 (quoting *Reid*, 490 U.S. at 739–40, 109 S.Ct. at 2172). This Court has recognized this command time and again, applying *Darden* to

a host of different statutes, including those in the employment context.

*Quinlan v. Secretary, U.S. Dep't of Labor*, 812 F.3d 832 (11th Cir. 2016)

(Occupational Safety and Health Act); *Virgo v. Riviera Beach*

*Associates, Ltd.*, 30 F.3d 1350 (11th Cir. 1994) (Title VII); *Ashkenazi v.*

*South Broward Hosp. Dist.*, 607 F. App'x 958 (11th Cir. 2015) (Age

Discrimination in Employment Act).  Congress's command here was

just as unambiguous as if Congress had spoken explicitly, and the

Department was not free to fashion a definition of "employer" and

"employee" that was inconsistent with the "general common law of

agency."  *Darden,* 503 U.S. at 323–24, 112 S.Ct. at 1348–49 (internal

quotation marks omitted).

Accordingly, even had the 2009 amendments not been effective,

then the 2006 regulations were plainly invalid *ab initio*—just as the

Department itself recognized when it conformed the regulations to the

common law in 2009.  Either way, the common law test of agency

applies.

### C.    Under the Common Law Test, Consolidated Citrus Was Not the Workers' Employer

Under the proper common law test, it is plain that Consolidated

Citrus did not act as a joint employer with Ruiz Harvesting.  Although

the district court did not reach this question (because it applied the wrong test), this Court can easily answer it in the first instance. Indeed, the workers abandoned their claims related to the 2009–10 season after the district court clarified that the common law test would apply to those claims accruing after the 2009 regulatory amendments.[12] *See* Doc. 182 at 12; Doc. 222 at 32.

That implicit but unmistakable concession is unsurprising. The focus of the common law agency test is on the "right to control the manner and means by which the [work] is accomplished." *Darden*, 503 U.S. at 323, 112 S.Ct. at 1348 (quoting *Reid*, 490 U.S. at 751–52, 109 S.Ct. at 2178–2179); *see also Antenor*, 88 F.3d at 933–34.[13]  Other relevant factors include: (1) the skill required; (2) the source of

---

[12] At one point in the litigation, the workers argued that they could satisfy the common law test of agency (which applied to the 2009–10 season). Doc. 156 at 9–10. But some of the factors the workers argued—importantly, including that Consolidated Citrus allegedly determined piece-rate wage—were later disproved at trial. *See* Doc. 222 at 40.

[13] Notably, the workers have never argued that even Ruiz Harvesting was Consolidated Citrus's agent. The contract Ruiz Harvesting and Consolidated Citrus signed made clear that it was an independent contractor agreement. *See* Doc. 193, ¶ 20 (plaintiffs' proposed findings of fact); *see also* Doc. 192, ¶ 47 (defendant's proposed findings of fact). *A fortiori*, the workers could not be Consolidated Citrus's agents.

42

instrumentalities and tools; (3) the location of the work; (4) the duration of the relationship between the parties; (5) whether the hiring party has the right to assign additional projects to the hired party; (6) the extent of the hiring party's discretion over when and how long to work; (7) the method of payment; (8) the hiring party's role in hiring and paying assistants; (9) whether the work is part of the regular business of the hiring party; (10) whether the hiring party is in business; (11) the provision of employee benefits; and (12) the tax treatment of the hired party. *Darden*, 503 U.S. at 324, 112 S.Ct. at 1348–49; *Reid*, 490 U.S. at 751–52, 109 S.Ct. at 2178–79.

The facts here pile up quickly to establish as a matter of law that these workers were not employees of Consolidated Citrus. It is undisputed that Ruiz Harvesting alone determined how many workers to employ, *see* Doc. 222 at 36; whom it should hire, *see id.*; how best to recruit productive potential workers and train its citrus harvesters, *see* Doc. 222 at 36; and how best to manage their productivity in the groves once they commenced work, *see id.* Even more important, the district court found (in findings subject to plain error), that Consolidated Citrus had no control over the workers' "pay method and rates," *see id.* at 40—

43

a critical finding, given that the workers were attempting to hold

Consolidated Citrus liable for failing to pay the required minimum

wage.  It is also undisputed that Consolidated Citrus had no direct legal

or contractual relationship with the workers, including for tax purposes.

*See id.* at 1, n.1; Doc. 162 at 23.  Most importantly, Consolidated Citrus

neither knew of, nor participated in, Ruiz Harvesting's unlawful

kickback scheme.  In short, Consolidated Citrus "lack[ed] … actual

control" over the workers; did not have the "authority to hire, fire, or

alter the employment conditions of the workers"; and did not "pay the

workers."  Doc. 162 at 25.  Consolidated Citrus, therefore, could not

have been their joint employer as measured under traditional agency

principles.

## II.   Even Under The Economic-Reality Test, Consolidated Citrus Was Not A "Joint Employer" With Ruiz Harvesting

As the district court recognized, even under the worker-friendly

economic-reality test—a test that is "striking in its breadth" and

intended to create employment relationships where the common law

would not, Doc. 162 at 28—the question of joint employment was not an

easy one.  Four factors weighed in favor of Consolidated Citrus and four

factors weighed in favor of the workers.  *See* Doc. 222 at 43–44.  The

court was not required to give factors "equal weight," and the court should have discounted those factors of "no value insofar as they apply to factual circumstances not here present." *Aimable*, 20 F.3d at 440. Although "no one factor is determinative," "the weight of each factor depends on the light it sheds on the farmworkers' economic dependence (or lack thereof) on the alleged employer, which in turn depends on the facts of the case." *Antenor*, 88 F.3d at 932–33. The district court improperly weighed the *Aimable* factors, and it should have entered judgment in Consolidated Citrus's favor on the breach of contract and remaining FLSA claims.

Although the parties disputed few facts relevant to the *Aimable* factors, Doc. 222 at 2, the district court was not able to resolve the joint employment issue at summary judgment. Doc. 162 at 25. That was because one "especially probative" factor here—"[t]he authority to determine pay rates and methods of payment"—was, indeed, in dispute. *Id.* The other factor the court could not resolve at summary judgment (because the parties did not brief it) was Consolidated Citrus's "relative investment in the equipment and facilities used in the harvesting

operations." *Id.* Otherwise, at summary judgment, the factors

appeared to be largely in equipoise. *Id.*

Both of these unresolved issues were resolved in ***Consolidated***

***Citrus's favor*** at the bench trial, Doc. 222 at 40, 42.[14]  Nonetheless, the

district court ruled that Consolidated Citrus was a joint employer under

*Aimable* for purposes of both the contract claims and the remaining

FLSA claims.  Doc. 222 at 43–44.  As to whether Consolidated Citrus

had "[t]he authority to determine pay rates and methods of payment,"

Doc. 162 at 25, the court concluded that Ruiz Harvesting "alone set

Plaintiffs' pay method and pay rates," Doc. 222 at 40.  This "especially

probative" factor, Doc. 162 at 25, weighed "solidly against a finding of

joint employment," Doc. 222 at 40.

---

[14] Although these two factors were resolved in Consolidated Citrus's favor, another factor flipped from being in Consolidated Citrus's favor.  At summary judgment, Judge Chappell determined that Consolidated Citrus had little involvement in preparing the payroll because "the time-keeping system merely generated raw data that was used by Ruiz Harvesting to create weekly payroll records" and "that Ruiz Harvesting was ultimately responsible for compensating Plaintiffs."  Doc. 162 at 23.  Judge Aspen disagreed, however, apparently due to his focus on the gate deduction claim, which was later abandoned, Doc. 249 at 2, and his failure to consider the fact that ***Ruiz Harvesting*** alone actually paid the workers.  *See* Doc. 222 at 40–41. The payroll factor should have weighed in favor of Consolidated Citrus, especially because it was undisputed that Consolidated Citrus had nothing to do with the kickbacks paid from the workers' weekly pay.

Likewise, the court concluded that Ruiz Harvesting "invested heavily in the equipment necessary for its business as a labor contractor," including providing "housing, as well as transportation to and from the groves," and all of the "equipment used by" the workers "on a daily basis," like "picking sacks, ladders, and tubs."  Doc. 222 at 42–43.  Accordingly, this factor, too, "favor[ed] [Consolidated Citrus's] position."  *Id.* at 42.

Still, the district court "readily conclud[ed]" based on the other factors that weighed in favor of the workers that Consolidated Citrus was a joint employer.  *Id.* at 44.  Those factors were (1) that Consolidated Citrus had at least some indirect control over the workers (*e.g.*, by assigning Ruiz Harvesting to each block; clocking workers in and out;  and inspecting working conditions); (2) that Consolidated Citrus was involved in preparing payroll, by providing timekeeping equipment; (3) that Consolidated Citrus owned the groves; and (4) that the work was integral to Consolidated Citrus's business.  *Id.* at 37–42.  None of these factors took into account, as they should have, that Consolidated Citrus had nothing to do with the operations involving the kickback scheme.

47

The trouble is that at least two of these factors (ownership of the land and importance of the work to the landowner's business) will **always** weigh in favor of joint employment under the economic-reality test whenever a landowner outsources its fruit harvesting, as Consolidated Citrus did here.  Indeed, the workers argued that there was a "strong presumption" of joint employment based on those two factors alone.  Doc. 173 at 18 (discussing *Rutherfood Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).  But it makes little sense for this balancing test to always lead to the same result—a finding of joint employment—no matter how little involvement the landowner may have had in the specific conduct that led to liability.

By far, the most probative consideration here was the factor the district court identified at the outset: who—Ruiz Harvesting or Consolidated Citrus—controlled the piece rate and method of payment?  That was the pivotal issue, because all allegations of wrongdoing stemmed from the failure to pay the required minimum wage.  *See Antenor*, 88 F.3d at 932–33 (although no factor is "dispositive," not all need be given equal weight); *Aimable*, 20 F.3d at 441 (noting that not all factors are always relevant).  Ruiz Harvesting "alone" set the piece

rate and pay methods.  Doc. 222 at 40.  And the record was undisputed that Consolidated Citrus knew nothing of the kickbacks.

Although the *Aimable* test is no doubt intentionally forgiving to workers, it should not be used to favor workers invariably—particularly when it is undisputed that the landowner had absolutely nothing to do with the alleged wrongdoing, *i.e.*, the forced kickbacks.  Even if the district court had been correct to apply *Aimable* (and it was not, for the reasons discussed in Section I), it should have put much more weight on the factor that was "especially probative" of the joint employment relationship under these unusual facts.  Because the district court found that Ruiz Harvesting had sole responsibility for setting the piece rate and paying the workers, and because Consolidated Citrus had nothing to do with the kickbacks, the district court should not have held Consolidated Citrus liable for Ruiz Harvesting's wrongdoing.

## CONCLUSION

For the reasons set forth above, this Court should reverse the decision of the district court holding Consolidated Citrus responsible as a joint employer with Ruiz Harvesting and enter judgment in favor of Consolidated Citrus.

Respectfully submitted,

/s/ Chilton Davis Varner
Chilton Davis Varner
Merritt E. McAlister
Billie B. Pritchard
**KING & SPALDING LLP**
1180 Peachtree St., NE
Atlanta, GA  30309
Telephone:  (404) 572-4600
Facsimile:  (404) 572-5100
cvarner@kslaw.com
mmcalister@kslaw.com
bpritchard@kslaw.com

David J. Stefany
Brian W. Koji
**ALLEN NORTON & BLUE, P.A.**
324 S. Hyde Park Ave., Suite 225
Tampa, FL 33606
Telephone: (813) 251-1210
Facsimile: (813) 253-2006
dstefany@anblaw.com
bkoji@anblaw.com

*Counsel for Appellant*

*Consolidated Citrus Limited*
*Partnership*

May 18, 2016

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(a), I certify that this brief complies with the length limitations set forth in Fed. Rule App. Proc. 32(a)(7) because it contains 10,368 words, as counted by Microsoft Word, excluding the items that may be excluded under Federal Rule 32(a)(7)(B)(iii).

I further certify that this Brief was filed in electronic format through the Court's CM/ECF system on the 18th day of May, 2016.

<u>/s/ Chilton Davis Varner</u>

*Counsel for Consolidated Citrus Limited Partnership*

## CERTIFICATE OF SERVICE

I certify that on May 18, 2016, I served the foregoing Brief of Appellant upon all counsel of record by and through the Court's CM/ECF system.

<u>/s/ Chilton Davis Varner</u>

*Counsel for Consolidated Citrus Limited Partnership*